UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK          ECF Case

CHRISTOPHER TONLEY, on behalf of          Civil Action No.: 05 CV 4257
himself and a class of persons similarly
situated,

                    Plaintiff,          **CLASS ACTION COMPLAINT FOR
VIOLATIONS OF ERISA**

      -against-

AMERICAN INTERNATIONAL GROUP,
INC., MAURICE P. GREENBERG,
HOWARD I. SMITH, MARTIN J.
SULLIVAN, DONALD P. KANAK,
RICHARD A. GROSIAK, AXEL I.          **JURY TRIAL DEMANDED**
FREUDMANN, JOHN DOES 1-10 (BEING
CURRENT AND FORMER MEMBERS
OF THE AIG RETIREMENT BOARD),

                Defendants.

      Plaintiff, a participant in, and beneficiary of, the AIG Incentive Savings Plan (the

"Plan"), on behalf of himself and a Class of all others similarly situated (the "Class"), alleges

the following on personal knowledge as to facts pertaining to Plaintiff and on information

and belief as to all other facts:

<u>PRELIMINARY STATEMENT</u>

      1.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income

Security Act, as amended, 29 U.S.C. §1132, ("ERISA") against fiduciaries of the Plan who are and were responsible

for the investment of its assets and administration.  Plan fiduciaries, including, the AIG Retirement Board ("ARB")

members breached their fiduciary duties to Plan participants, causing the loss of millions of dollars of Plan

participants' retirement savings.

1

2.       Plaintiff was an employee of American General Corporation ("AGC") before and after its merger with defendant American International Group ("AIG") and was a participant in, and beneficiary of, the Plan and prior thereto was a participant in the American General Employees' Thrift and Incentive Plan, and the American General Agents' and Managers' Thrift Plan (collectively, the "AGC Plan").  As a participant in the Plan, Plaintiff was entitled to set aside a certain percentage of his annual base salary and invest those funds through the Plan.  Among the investment options in the Plan was AIG stock.  Defendants encouraged Plan participants to purchase as much of the AIG stocks as possible.

3.       During the Class Period (as defined below), based in part on statements of AIG and various of the Individual Defendants, participants in the Plans believed AIG was a financially sound investment for their retirement.  In turn, participants continued to allocate significant amounts of their individual contributions to AIG stock and maintained their assets in that investment option.

4.       Defendants' breaches of their fiduciary duties to Plan participants revolve around their continued imprudent retention and purchases of AIG common stock during the Class Period.  Further, Defendants failed to inform Plan participants that material public statements about AIG's businesses, current and future financial prospects and results were false and misleading, causing AIG's stock to trade at artificially inflated levels during the Class Period.

5.       At the outset of and throughout the Class Period, Defendants failed to disclose material facts about AIG's business operations.  When AIG was forced to disclose the true facts behind its financial health and the true state of its operations, the value of AIG stock declined precipitously taking with it the value of Plan participants' retirement savings, including those of Plaintiff and the Class.

6.       Since the Plan's holdings in AIG stock comprised a significant percentage of the overall value of the assets the Plan held on behalf of its beneficiaries, the long-term retirement savings of Plaintiff and members of the Class were dependent, to a substantial degree, on the performance of AIG common stock.  So, too, were their retirement fortunes dependent on the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of Plan assets.

7.       Thus, Defendants breached their fiduciary duties to the Plan and its participants under ERISA by, among other things:

(a)      Selecting and maintaining AIG stock as an investment alternative for Participant Contributions under the Plan when it was no longer a suitable or prudent Plan investment option.

(b)      Encouraging employees to invest in AIG stock.

(c)      Failing to divest the Plan from shares in AIG Stock when continuing to hold that investment option became imprudent as a result of the undisclosed financial and operating performance of the Company.

(d)      Abdicating their continuing duty to review, evaluate and monitor the suitability of the Plan's investment in AIG Stock.

(e)      Failing to provide accurate, material information to enable Plan participants to make informed investment decisions concerning their contributions invested in AIG Stock.

8.      As a result of Defendants' breaches of fiduciary duties, the Plan and Plaintiff and members of the Class have suffered substantial losses of retirement savings and anticipated retirement income from the Plan.  As such, under ERISA, Defendants are obligated to restore to the Plan the losses that resulted from their breaches of their fiduciary duties.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

10.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and/or some Defendants reside or maintain their primary place of business in this district.

## THE PARTIES

11.      During the Class Period, Plaintiff, a former employee of AGC, participated in the Plan pursuant to ERISA § 3(7), 29 U.S.C. § 1102(7).  Among other available Plan options, Plaintiff invested in AIG stock for his retirement account.

12.      Defendant AIG is a Delaware corporation with its principal executive offices located at 70 Pine Street, New York, New York.  During the Class Period, AIG's common stock traded on the New York Stock Exchange.

13.     AIG is the Plan sponsor and administrator and exercises discretionary authority – acting through its Board of Directors and officers, including defendant Manuel P. Greenberg ("Greenberg"), and the ARB – with respect to management and administration of the Plan and/or management and disposition of Plan assets.

14.     During the Class Period, AIG acted through its officers and employees, including the individual defendants, as the sponsor and administrator of the Plan.  During the Class Period, defendants AIG and Greenberg had effective control over the activities of its officers and employees, including their Plan-related activities.  Through Greenberg the ARB or otherwise, AIG had the authority and discretion to hire and to terminate its officers and employees who were responsible for administration of the Plan.

15.     Through Greenberg, AIG also had the authority and discretion to appoint, monitor, and remove officers and employees from the individual fiduciary roles with respect to the Plan.  By failing properly to discharge their fiduciary duties under ERISA, Defendants breached the duties they owed to Plaintiff and members of the Class – Plan participants.

16.     Defendant Greenberg, was at all times relevant hereto, Chairman of the Board and Chief Executive Officer of AIG until his resignation in March 2005.  Greenberg was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to:  (i) management and administration of the Plan and/or (ii) management and disposition of the Plan's assets.

17.     Defendant Howard I. Smith ("Smith") was, at all times relevant hereto, Vice Chairman of the Board, Chief Administrative Officer, and Chief Financial Officer of AIG until he was fired in March 2005.  Smith was a fiduciary of the Plan within the meaning of ERISA §  3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to:  (a) management and administration of the Plan; and/or (b) management and disposition of the Plan's assets.

18.     Defendant Martin J. Sullivan ("Sullivan") was, at all times relevant hereto, Vice Chairman of the Board and Co-Chief Operating Officer of AIG until March 2005.  Sullivan was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to:  (a) management and administration of the Plan; and/or (b) management and disposition of the Plan's assets.

19.     Defendant Donald P. Kanak ("Kanak") was, at all times relevant hereto, Vice Chairman of the Board and was co-Chief Operating Officer of AIG until March 2005, when he was appointed Chief Operating

4

Officer.  Kanak was a fiduciary of the Plan within the meaning of ERISA § 3(2l)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to:  (a) management and administration of the Plan; and/or (b) management and disposition of the Plan's assets.

20.      Defendant Richard A. Grosiak ("Grosiak") was, at all times relevant hereto, from approximately 2002,  an administrator of the Plan and the AGC Plan under ERISA § 3(16)(A), 29 U.S.C. §1002(16)(A), and was a member of the ARB.   Defendant Grosiak was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority with respect to:  (a) management and administration of the Plan; and/or (b) management and disposition of the Plan's assets.

21.      Defendant Axel I. Freudmann ("Freudmann") was, at all times relevant hereto, Senior Vice President of Human Resources.  Freudmann was a member of the ARB and a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) and of the AGC Plan from approximately 2002, in that he exercised discretionary authority to:  (a) management and administration of the Plans; and/or (b) management and disposition of the Plans' assets.

## CLASS ACTION ALLEGATIONS

22.      Plaintiff brings this action as a class action, pursuant to Rule 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of himself and all others similarly situated who were participants in or beneficiaries of the Plan during the period from August 29, 2002 through March 31, 2005 (the "Class Period").

23.      The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, several thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

24.      Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are whether:

(a)      Defendants each owed a fiduciary duty to Plaintiff and the Class;

(b)      Defendants breached their fiduciary duties to Plaintiff and the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)      Defendants violated ERISA; and

5

(d)    Plaintiff and members of the Class have sustained damages and, if so, the appropriate measure thereof.

25.    Plaintiff's claims are typical of the claims of the Class members because Plaintiff and the Class members each sustained damages arising from Defendants' wrongful conduct in violation of ERISA.

26.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and complex litigation under federal law.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

27.    Class action status in this ERISA action is warranted under Fed.R.Civ.P. 23(b)(1)(B) because prosecution of separate actions by individual Class members would create the risk of adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

28.    Class action status is also warranted under the other subsections of Fed.R.Civ.P.23(b) because:

(a)    Prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants;

(b)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole; and

(c)    Questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLAN

29.    The Plan is an "employee pension benefit plan" as defined by § (3)(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  In this action for breach of  fiduciary duty, the Plan is neither a plaintiff nor a defendant.  Rather, the relief Plaintiff requests is for the benefit of the Plan and for the benefit of its participants.

30.    The Plan,  a defined contribution retirement savings plan, in which at least several thousand AIG employees participated, offers limited investment options.  Among those options is AIG stock.  AIG sponsored the

Plan, a 401(K) plan designed to enable participants to save for retirement.  During the Class Period, participants were able to allocate their contributions only among the limited investment vehicles offered by the Plan.

31.     Throughout the Class Period, the Plan held a significant portion of its assets in AIG stock.


## DEFENDANTS' FIDUCIARY STATUS

32.     During the Class Period, each Defendant acted as a fiduciary of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).  Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets, and had discretionary authority or responsibility for the Plan's administration.

33.     During the Class Period, all Defendants were directly involved with the administration of the Plan and the investment of its assets.

34.     AIG did not delegate all fiduciary responsibilities for the Plan to an external provider.  Instead, Defendants chose to comply with ERISA § 402(a)(1), internalizing many fiduciary functions.  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), requires that every plan provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the Plan."

35.     During the Class Period, AIG's direct and indirect communications with Plan participants included statements regarding investments in AIG stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan-related documents, which incorporated and/or reiterated these statements.  AIG, Greenberg, Smith, Sullivan, Kanak, Grosiak and Freudmann, acted as fiduciaries with respect to these communication activities.

## DURING THE CLASS PERIOD, THERE WAS AN
## OVER CONCENTRATION OF AIG STOCK IN THE PLANS

36.     During the Class Period, the AGC Plan, which were then included in the Plan were over concentrated in AIG stock.  On July 2, 2002, AIG filed a Form 11-K annual report with the SEC for the American General Employees' Thrift and Incentive Plan, for the year ended December 31, 2001.  The annual report stated that the plan had $499.5 million, or a staggering 67% of the plan's total assets of $746.3 million, invested in AIG common stock.  Similarly, the Form 11-K annual report, for the year ended December 31, 2001, for the American

General Agents' and Managers' Thrift Plan, stated that $106.0 million out of that plan's total assets of $158.8 million, or 67%, was invested in AIG common stock.

37.     According to the AIG Plan's Incentive Savings Plan Summary and Annual Report, produced by the defendants , the value of the AIG Plan's assets was $2.04 billion as of December 31, 2003, compared to $947 million as of January 1, 2003.  The plan experienced an increase in assets due largely to the merger into it of the American General Plans.

<strong><u>SUBSTANTIVE ALLEGATIONS</u></strong>

**A.     AIG's Stock Price Began To Suffer In Late 2000
As Investors Wondered About AIG's Financial Condition**

38.     Since at least 2000, defendant Greenberg has manipulated AIG's financial results to drive AIG's stock price higher and to establish the perception that AIG was the premier insurance and financial services company in the world.  The plan succeeded as AIG's stock price was driven higher and maintained at an inflated level by AIG's manipulation of its financial results.

39.     In 2000, AIG embarked on an acquisition spree using its own shares to purchase other insurers. On August 18, 2000 AIG entered into an agreement to merge with HSB Group, Inc. a specialty insurer.  HSB's shareholders were given AIG shares in exchange for HSB stock in the merger.  In the fall of 2000, defendant Greenberg discussed with AGC's then chairman, Robert Devlin, the possibility of a merger between AGC and AIG. Greenberg contemplated a stock for stock exchange in any merger.

40.     AIG's stock pierced the hundred dollar per share level in late 2000.  However, the price began to decline shortly thereafter.  According to published reports in late 2000 and early 2001, investors were growing increasingly concerned that AIG was under-reserved for future claims.  During the third quarter of 2000 AIG reserves fell to $24.6 billion from $24.7 billion a year earlier, despite an increase in the number and amount of policies sold by AIG.

41.     For AIG to increase its reserves would have caused a decline in reported earnings which defendant Greenberg sought to avoid because it would have negatively impacted AIG's stock price further.

**B.     Greenberg Orchestrated Numerous Manipulations
Designed To Maintain AIG's High Stock Price**

**(a)     Misleading Press Releases**

8

42.     Beginning in 2000, as AIG was formulating the growth-by-acquisition strategy to be funded with its own stock, AIG changed the manner of its presentation of its quarterly earnings press releases.  In the press release announcing AIG's first quarter 2000 operating results, AIG excluded realized capital losses from its calculation of its headline income growth.  As a result, for the first quarter of 2000, AIG was able to report income growth of 15.3% rather than the 12.3% growth that would have been reported had realized capital losses been included.

43.     This method of reporting headline net income growth in AIG's quarterly press releases continued right up through 2001 as AIG was negotiating to buy AGC with AIG stock and through the date of the stockholder vote and the Valuation Period for the end of August 2001.

44.     According to Shiff's Insurance Observer, February 26, 2004,  <u>AIG:  The Art of Manipulation?</u> <u>Deceptive Earnings Releases</u>, AIG was able to promote its financial condition in a way to minimize negative aspects by excluding realized capital losses from its headline net income growth rate; AIG was able to report 13.1% growth for the second quarter of 2000 instead of 10.2% growth; and 14.6% growth for the third quarter of 2000 instead of 9.3% growth and 14.8% growth for the fourth quarter of 2000 instead of 11.5% growth; 15.2% growth for the first quarter of 2001 instead of 13.8% growth and 15.8% growth in the second quarter of 2001 instead of 15.6% growth.

**(b)     AIG Foregoes Necessary Increases To**
**Reserves To Avoid Reducing Operating Earnings**

45.     AIG had also been boosting net income by foregoing necessary increases to loss reserves during 2000 and 2001.

46.     To appear to bolster AIG's reserves, defendant Greenberg engineered a deal with GenRe Corporation ("GenRe") that was disguised to look like an insurance transaction but which was actually a loan.  The deal was structured to look like a transaction that would allow AIG to raise its reserves by $250 million in the fourth quarter of 2000 and by a further $250 million in the first quarter of 2001 without deducting any such income from earnings.

47.     In February 2001 Greenberg announced that reserves had been increased by $106 million in the last quarter of 2000 and $63 million in the first quarter of 2001.

48.     In February 2003 AIG announced that it would take a $2.8 billion charge to boost loss reserves from the 1997 to 2001 policy years.  The increase in loss reserves concentrated the loss in AIG's fourth quarter 2002

financial statements.  Soon after the announcement, Fitch ratings  agency placed AIG's triple-A server debt ratings on "rating watch negative" and Moody's changed its ratings outlook from "stable" to "negative" and placed AIG's main U.S. insurance subsidiary's triple-A ratings under review for a possible downgrade.

49.     AIG also admitted that it had been improperly treating its transactions with Union Excess as legitimate reinsurance and that AIG may be treated as part of AIG and result in the reduction of AIG's net worth by $1.1 billion.

**C.     AIG Engaged In Fraudulent Bidding And Steering Schemes
To Illegally Obtain High Profit Margin Insurance Business**

50.     In order to capture extra business and high profit margins, throughout the Class Period, Defendant AIG, engaged in systematic "steering" and "bid-rigging" transactions with the Marsh & McLennan Companies ("Marsh") and ACE insurance brokerage firms.

51.     On October 14, 2004, the Office of the New York State Attorney General announced the initiation of a civil action against Marsh, alleging that it sent unsuspecting clients to insurers, including AIG and ACE, with whom it had payoff agreements, and that Marsh, in concert with these insurers, solicited rigged bids for insurance contracts.  AIG is named in the Attorney General's complaint as a participant in the steering and bid-rigging.

52.     On that same date, the New York State Attorney General announced that two AIG executives had pleaded guilty to a first-degree felony count of a "scheme to defraud," the purpose of which included allowing Marsh to control the insurance market and "to protect incumbent insurance carriers when their business was up for renewal," including AIG.

53.     Specifically, the New York Attorney General's complaint stated that AIG had "engaged in systematic bid manipulation," in conjunction with Marsh.  According to the complaint, when an AIG client's insurance was up for renewal, Marsh solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG with a target premium and the policy terms for the quote.  If AIG agreed to quote the target provided by Marsh, AIG kept the business, regardless of whether it could have quoted more favorable terms or premium.

54.     In addition, the New York State Marsh complaint stated that Marsh created lists or "tiers" of "those insurance companies whose products its employees were to sell more vigorously to clients, lists based not on price or service, but on the amount of money the insurance companies would pay Marsh.  It rewarded those employees who sold clients more insurance from these complicit insurance companies, and it chastised those who did not."  Id., ¶

**10**

30.  A Tiering Report from 2003 states that its purpose was, <u>inter alia</u>, "[t]o monitor premium placements to assure maximum concentration with Tier A and B Partner Markets," and the first carrier listed on this roster of preferred insurance carriers is AIG.  AIG accounts were generally listed as Tier A or B, meaning they were favored by Marsh.

55.     AIG improperly reaped billions of dollars in revenues from insurance steered its way as a result of its payment of the kickback fees and its involvement in the illicit scheme.  The booking and reporting of such illegally earned profits maintained AIG's stock price at inflated levels as reflected by the reaction to the disclosure of the New York Attorney General's complaint.  On such disclosure, the price per share of AIG common stock plummeted $6.80 per share or 10.15% from $66.99 per share on October 13, 2004 to $60.19 per share on October 14, 2004.  AIG's stock price continued its decline the next day on October 15, 2004, falling an additional $2.34 per share to $57.85 per share, representing a two-day stock price decline of $9.14 per share, or 13.64%.

**D.     AIG Understated Its Liabilities For Losses And Overstated Income Through A Series Of Sham Reinsurance Contracts**

56.     AIG entered into sham reinsurance transactions with related parties that purported to bolster, and portray a misleading picture of, its loss reserve position and financial strength.  In late 2000 and early 2001, when AIG was seeking to use its stock as currency for acquisitions, AIG and GenRe, the reinsurance subsidiary of Berkshire Hathaway entered into sham insurance transactions which had the effect of inflating AIG's reserves by $500 million as well as inflating premium revenue.

57.     AIG admitted, on March 31, 2005, that the foregoing transaction was improperly recorded as insurance "in light of the lack of evidence of risk transfer".

58.     On February 14, 2005, AIG announced that it received subpoenas from the Securities and Exchange Commission and the New York Attorney General's Office concerning AIG's utilization of nontraditional insurance products and reinsurance transactions, as well as its accounting for such transactions.

59.     A <u>New York Times</u> article dated March 31, 2005, reported that the New York Attorney General was investigating AIG's treatment of reinsurance companies as purportedly separate entities in order to help hide AIG's exposure to risk; reinsurance transactions by AIG that were tantamount to loans that should have been so listed; assets and liabilities being swapped to smooth earnings; and, finally, the use by AIG of finite reinsurance to smooth earnings.  On March 30, 2005, AIG admitted that its accounting for a number of transactions was improper.

60.     During the Class Period, AIG's financial results were materially but falsely enhanced by a series of reinsurance transactions, including:

-       AIG's transaction with GeneralRe in late 2000 and early 2001.

-       Through 2004, AIG ceded reinsurance to a Barbados company, Union Excess Reinsurance, and reported additions to AIG's net income in the amount of at least $1.1 billion; AIG improperly recognized such additional net income.  Under applicable accounting rules, AIG was not entitled to recognize that net income because Union Excess Reinsurance was/is a "related party."

-       Through 2004, AIG ceded a significant amount of reinsurance to a Bermuda company, Richmond Insurance Company.  AIG recognized net income as a result of those reinsurance transactions; AIG improperly recognized such additional net income.  Under applicable accounting rules, AIG was not entitled to recognize that net income because Richmond Insurance Company was/is controlled by AIG.

-       Between 2000 and 2003, AIG engaged in insurance transactions with a Barbados company, Capco Reinsurance Company, the result of which was to allow AIG to avoid the reporting of $200 million of losses by converting same to capital losses the latter which do not impact reported net income or earnings per share.

**E.      AIG's Other Financial Manipulations**

61.     During the Class Period, AIG manipulated its financial results to increase earnings:

-       Between 2001 and 2003, AIG engaged in derivative transactions involving its bond portfolio and, contrary to accounting and reporting requirements, reported $300 million in capital gains as $300 million in investment income, which allowed AIG to overstate its earnings.

-       AIG misclassified "certain items" which resulted in a $3 billion overstatement of AIG's net income between 2000 and 2004; In 2003, the misclassification, caused AIG's operating income to be overstated by about $600 million.

**F.      AIG's Stock Has Fallen Closer To Its True Value**

62.     As of April 1, 2005, AIG's stock price fell to a low of $50.95 per share, or a 45.7% decrease in value from its price of $93.96 on December 1, 1998, at the beginning of the Class Period.  Moreover, this represents a 34.0% decrease in value from AIG's per share price of $77.23 on August 29, 2001, the date when (a) AIG completed its acquisition of AGC; and (b) AGC common stock held under the AGC Plan was exchanged for AIG common stock.

63.     AIG is still being investigated and news reports indicate that it is expected that AIG will have to restate its financials and reduce its book value by billions of dollars after the investigation is complete.  On April 1,

2005, an article by <u>Reuters</u> reported that a source, close to the investigation, said that the investigation involves at least 20 substantial transactions for the improper accounting by AIG.  "They are pretty significant transactions," the source said, referring to the ever expanding list of deals under investigation by federal and state authorities.  On March 30, 2005, AIG announced it was delaying filing its 10-K annual report, for a second time, "as it tallies other potential accounting improprieties."

64.     After these disclosures, Standards & Poor's downgraded AIG's long-term bonds and certain other debt below triple-A.

**<u>COUNT I</u>**

**Failure Prudently And Loyally To Manage the Assets Of The Plan**
**<u>Breaches Of Fiduciary Duties In Violation Of ERISA § 404 – All Defendants</u>**

65.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

66.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

67.     Defendants were responsible for the selection, maintenance and monitoring of the Plan's investment options, including the option to purchase and to hold the AIG Stock.

68.     Defendants exercised discretionary authority and/or control over management of the Plan or disposition of the assets of the Plan and were, during the Class Period, responsible for ensuring that investment options made available to participants in a plan were prudent.  Defendants were responsible for ensuring that all investments in the AIG Stock in the Plan were prudent, and are liable for losses incurred as a result of such investments being imprudent.

69.     In direct violation of their duty of loyalty to the Plan and its members, Defendants failed to diverge from the Plan documents and/or directives that they reasonably should have known would lead to an imprudent result or would otherwise harm Plaintiff and members of the Class.  Defendants, either themselves or through persons they direct or control, blindly followed Plan documents and directives, leading to an imprudent result that harmed the Plan's participants and beneficiaries.

70.     Defendants breached their duties prudently and loyally to manage the assets of the Plan.  During the Class Period, upon the exercise of reasonable care, Defendants should reasonably have known that investment in

13

AIG Stock was imprudent in that any such investment was unsuitable and inappropriate for either participants or AIG matching contributions to the Plans.  During the Class Period, Defendants, in violation of their fiduciary duties, continued to offer the AIG Stock as an investment option for the Plan and to direct and approve Plan investment in the AIG Stock, instead of other investments as permitted by the Plan.  Despite the imprudence of any investment in the AIG Stock Fund during the Class Period, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan's participants and beneficiaries, from suffering losses as a result of the Plan's investment in AIG Stock.

71.     Defendants also breached their duty of loyalty by failing to administer the Plan with single-minded devotion to the interests of Plaintiff and members of the Class, regardless of Defendants' own interests.

72.     Defendants also breached their fiduciary duties by failing to disclose that they had failed prudently and loyally to manage the assets of the Plan in the exercise of their discretion with respect to the AIG Stock as an investment option in the Plan.

73.     As a direct and proximate result of Defendants' breaches of their fiduciary duties to Plaintiff and the Class, the Plan, and indirectly Plaintiff and the members of the Class, suffered damages for which Defendants' are liable.

**COUNT II**

**Failure To Monitor The Plan And Provide The Administrator Of The Plan
And Other Fiduciaries With Accurate Information
Breaches Of Fiduciary Duties In Violation Of ERISA § 404**

74.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

75.     During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  By virtue of their fiduciary responsibilities, Defendants were bound to monitor other fiduciaries and to provide them with information sufficient to perform their duties overseeing the Plan and their investments.

76.     Defendants breached their duties to monitor and inform by:

(a)     Failing to ensure that the monitored fiduciaries had access to knowledge about the AIG's operations and financial results, as alleged above, which made the AIG Stock an imprudent retirement investment;

(b)      Failing to ensure that the monitored fiduciaries appreciate the increased risk posed by the significant investment by rank and file employees in the AIG Stock;

(c)      Failing to disclose to the monitored fiduciaries accurate information about the operations and financial results of AIG that Defendants reasonably should have known the monitored fiduciaries needed to make sufficiently informed decisions about what investment options the Plan should continue to offer.

77.      Defendants are liable as co-fiduciaries because:

(a)      They participated in the fiduciary breaches by their fellow Defendant-fiduciaries in the activities implicated in this Count;

(b)      They enabled the breaches by these Defendants; and

(c)      They reasonably should have known of these breaches yet made not effort to remedy them.

78.      As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

### COUNT III

**Failure To Provide Complete And Accurate
Information To The Plan's Participants And Beneficiaries
Breaches Of Fiduciary Duties In Violation Of ERISA §§ 404 And 405**

79.      Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

80.      During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

81.      During the Class Period Defendants' fiduciary duties bound them to ensure that communications by and about the Plan and its assets were truthful, complete and not misleading, including information concerning the investment options the Plan offered.

82.      Throughout the Class Period, Defendants failed to provide participants in the Plan with complete and accurate information regarding AIG's operations and financial conditions necessary for Plan participants accurately to assess the quality of an investment in the AIG Stock.  Defendants conveyed false and misleading material information to the investing public and to Plaintiff and the Class, regarding the soundness of AIG commons stock and the prudence of investing retirement savings in the AIG Stock.  Because large percentages of the assets of

15

the Plan were invested in the AIG Stock during the Class Period, losses therefrom materially affected the value of

the retirement assets of Plaintiff and the Class.

83.     Defendants' fundamentally deceptive affirmative misrepresentations and omissions were material

to the determination of Plaintiff and the members of the Class whether investing in or maintaining their investments

in the AIG Stock was prudent.  As such, Plaintiff and members of the Class are presumed to have relied to their

detriment on the misleading statements, acts and omissions of Defendants.

84.     As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and

indirectly Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

### COUNT IV

**Failure To Act Exclusively In The Interests Of Participants In The Plan
Breaches Of Fiduciary Duties In Violation Of ERISA §§ 404 And 405**

85.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as

fully set forth herein.

86.     During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29

U.S.C. §1002(21)(A).

87.     Defendants were duty bound to act with undivided loyalties to the Plan, binding them to discharge

their responsibilities solely in the interest of Plaintiff and the members of the Class and for the exclusive purpose of

providing benefits thereto.

88.     Defendants breached their duty of loyalty by:

(a)     Failing to engage independent fiduciaries who could make independent judgments

concerning the Plan's investments in the AIG Stock;

(b)     Failing to notify appropriate federal agencies, including the United States Department of

Labor, of the facts and transaction which made the AIG Stock an unsuitable investment for the Plans;

(c)     Failing to take such other steps as were necessary to ensure that the interests of Plaintiff

and members of the Class were loyally and prudently served;

(d)     With respect to each of the failure listed in the preceding sub-paragraphs, Defendants

failed adequately to inform Plaintiff and members of the Class to prevent general investors, creditors and others from

discovering AIG's financial and operational weaknesses; and

16

(e)     By otherwise placing the interests of AIG and themselves above the interests of the participants with respect to the investments of the Plan in the AIG Stock.

(f)     As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

### COUNT V

### Prohibited Transactions
### In Violation Of Erisa § 406

89.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

90.     By virtue of all the facts and events alleged herein, Defendants, in connection with their action and omissions in authorizing and causing the Plan to continue to offer the AIG Stock as an investment option during the Class Period and permitting Plaintiff and Class to invest in AIG Stock at a time when Defendants reasonably should have known that AIG's operational and financial health were deteriorating – material facts undisclosed or misrepresented to the public – and that as a result, the prices per share at which the Plan was acquiring AIG common stock grossly exceeded fair market value, caused the Plan to engage in transactions that constituted direct or indirect sales or exchanges of property between the Plan and the party-in-interest, in violation of ERISA § 406(a), 29 U.S.C. § 1106(a).

91.     Because the price Defendants caused the Plan to pay for such shares was materially, artificially inflated, exceeding fair market value, the prohibited transactions are not exempt under the provisions of ERISA § 408(e)(1), 29 U.S.C. § 1108(e)(1).

92.     AIG is liable for this violation as a "party-in-interest" as defined in ERISA § 3(14)(c) for participating in the prohibited transactions.

93.     During the Class Period, AIG common stock was artificially inflated in value such that Defendants continued to engage in prohibited transactions by causing the Plan to pay an artificially inflated price for AIG common stock.

94.     During the Class Period, the Plan invested, upon information and belief, millions of dollars in both participants and company-matching contributions in AIG common stock, at artificially inflated prices.  The Plan and their participants thus over-paid for their "participation interests" in the Plan.

95.     Because the Plan's acquisitions of AIG common stock at artificially inflated prices were prohibited transactions, a per se violation of ERISA § 406(a), 29 U.S.C. § 1106(a), under ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff seeks on behalf of himself and the members of the Class to rescind all transactions purchasing shares of AIG Stock.

96.     Further, to restore the Plan and their participants and beneficiaries to the positions they would have been in had Defendants not engaged in the prohibited transactions, the Plan is entitled to recover the amount the contributions used to purchase AIG commons stock for the Plan would have earned had such amounts been invested in suitable investment options.

### SECTION 404(c) DEFENSE INAPPLICABLE

97.     The Plan suffered a loss, and Plaintiff and the members of the Class suffered losses because substantial assets in the Plan were invested in AIG Stock during the Class Period as a direct or proximate result of Defendants' breaches of the fiduciary duties they owed to Plaintiff and members of the Class.

98.     As to contributions invested in the AIG Stock, Defendants were responsible for the prudence of investments offered under the Plan unless participants in the Plan themselves  effectively exercised informed control over the assets in the Plan  in their individual accounts pursuant to ERISA § 404( c), 29 U.S.C. § 1104( c) and the regulations promulgated thereunder.

99.     Defendants did not comply with those provisions.  Defendants understood that even an experienced, learned insurance company analyst such as David Schiff of Schiff's Insurance Observer in his July 25, 2002 issue stated AIG "is not, however, easy to understand, and cannot be fully understood by an outsider."  Rather than taking the necessary steps to ensure effective participant control by complete and accurate disclosure of material information, Defendants did the opposite.  As a consequence, participants in the Plan did not have informed control over the assets of the Plan that were invested in the AIG Stock Fund, and Defendants remained entirely responsible for ensuring that such investments were and remained prudent.

### COUNT VI

18

**As And For A First Cause Of Action**
**On Behalf Of The Plan For Breach Of Contract Against AIG**

100.     Plaintiff repeats and realleges each and every allegations set forth in all previous paragraphs as if fully set forth herein.

101.     On May 11, 2001 AG and AIG announced that they had reached an agreement to merge.  The agreement called for AIG to use its stock to acquire AG.  The merger agreement contained a "collar" which gave AIG an incentive to manipulate the price of AIG stock in summer of 2001.

102.     The exchange ratio in the merger agreement provided that if AIG stock's average of its mean price during a certain time frame (the "Valuation Period") fell to or below $76.20 per AIG share then AIG would pay AG shareholders .603 of AIG stock per share of AG stock, approximately 10% than it would have to otherwise pay.

103.     At the time the merger agreement was signed AG was trading at a price of approximately $43 per share; AIG was trading at $80.93 per share at the same time.  During the Valuation Period, AIG's stock price fell to near the point where it would have to issue more shares in the merger.  AIG and Greenberg were determined to ensure that AIG stayed as high as possible through 2001 at least until the close of the Valuation Period.

104.     According to published reports, during the Valuation Period, defendant Greenberg, called then Chairman of the New York Stock Exchange, Richard Grasso, "to ask him to help shore up the stock's sinking price." According to published reports, someone in Richard Grasso's office allegedly called traders working for the AIG specialist, Spear, Leeds & Kellogg ("SL&K") on the floor of the New York Stock Exchange.  The Wall Street Journal Online, Hank Greenberg Probed By U.S. Over Stock Price, November 24, 2004, C1, Kate Kelly, Kara Scannell.

105.     During late August 2001, during a portion of the Valuation Period, Credit Suisse First Boston ("CSFB") made bids for AIG stock that were higher than the AIG stock's last sale price by over $.10 per share. Trades executed at such bids boosted the daily mean trading price of AIG stock during the Valuation Period which in turn boosted AIG's average price per share during the Valuation Period.  In late 2004, CSFB received a grand jury subpoena for information about the brokerage firm's trading activities in August 2001.  According to The Wall Street Journal, people at AIG's stock specialist, SL&K, have reportedly said there was often talk about defendant Greenberg repeatedly calling SL&K to complain about its handling of AIG stock.  According to one person at SL&K, defendant Greenberg told people at SL&K that he did not want AIG's stock price to fall below a certain

level.  The Wall Street Journal-Onliner Markets:  <u>CSFB's Trading of AIG Shares Is Scrutinized,</u> December 14, 2004, C1, by Kate Kelley and Kara Scannel.  At the time, SL&K, was owned by Goldman Sachs & Co., AIG's investment banker on the AGC-AIG deal.

106.    The price of AIG stock was sustained at the price sought by defendants AIG and Greenberg during the Valuation Period.  Thereafter, the price of AIG stock declined to an adjusted close of $75.73 per share, and recovered to an adjusted close of $77.46 per share on August 30, 2001 and then continued it decline all the way down to $72.18 per share on September 7, 2001.

107.    AIG's daily stock volume before and after the Valuation Period, reflects, and provides corroborating evidence of, Defendants' manipulation of the stock price.

(a)    From July 13, 2001 through August 13, 2001 the average daily trading volume of AIG common stock on the NYSE were approximately 4.37 million shares per day.

(b)    From August 14, 2001 through August 27, 2001 the average daily trading volume per day of AIG stock for the NYSE soared to 6.97 million shares.

108.    On August 29, 2001, AIG acquired AGC.  On that same date, AIG filed a Form S-8 with the SEC, registering shares of stock to be issued under various plans, including the AGC Thrift Plan.  The S-8 Registration Statement incorporated by reference AIG's annual report on Form 10-K for the year ended December 31, 2000, and AIG's Quarterly Reports on Form 10-Q for the quarters ended March 31 and June 30, 2001.  The S-8 Registration Statement was signed by Defendant Greenberg and Defendant Smith.

109.    The merger agreement constitutes a contract for the benefit of the plaintiffs and the class to which defendant was a party under New York law applicable to the Merger Agreement by terms of the Merger Agreement Article IX.

110.    The Plan's AGC stock was transferred and/or tendered to AIG as required by the merger agreement and the proxy prospectus.

111.    The proxy-prospectus soliciting the approval of the merger constituted an offer which the Plan accepted thus forming an express contract or a contract implied in fact from Defendant's conduct and Plaintiff's and the Class' change in position and detrimental reliance thereon.

112.    As a result of Defendant AIG's breach of contract the Plan has suffered damages.

113.    Defendant AIG breached the express terms of the contract.  The implied covenants of good faith and frustrated the objective of the contract by manipulating the price of its common stock to reduce the consideration to plaintiff and class.

114.    The Plan has suffered a injury because they had contractual rights under the merger agreement and applicable law of the State of New York.

115.    The Plan's rights under the merger agreement had ripened by the closing date because all conditions precedent to the closing had been met.

### COUNT VII

**As And For A Second Cause Of Action On Behalf Of The Plan For
Tortious Interference With Contractual Relations And Interference
<u>With Prospective Economic Benefit Against Greenberg And AIG</u>**

116.    Plaintiff repeats and realleges each and every allegation set forth in all previous paragraphs as if fully set forth herein.

117.    The merger agreement and proxy prospectus constitute a contract for the benefit of the Plan to which defendant AIG was a party.

118.    Under terms of the contract the Plan was to receive shares of AIG common stock in exchange for shares of American General common stock in an amount to be determined during the Valuation Period.

119.    Defendants unlawfully, intentionally and maliciously interfered with the contract between plaintiffs and AIG by manipulating the price of AIG stock in order to reduce the amount of AIG stock to be received by the Plan.

120.    The Plan has suffered damages.

121.    Defendants' conduct was the proximate cause of Plaintiff's and the Class' damages.

### COUNT VIII

**<u>On Behalf Of The Plan Against Defendant AIG For Unjust Enrichment</u>**

122.    Plaintiff repeats and realleges each and every allegation set forth herein as if fully set forth herein.

123.    Alternatively, if there is any doubt surrounding the enforceability or meaning of the terms of the contract in question the Plan asserts claims in quasi-contract for unjust enrichment.

124.    Defendant AIG by its conduct and the conduct of its agents and servants has deprived the Plan of benefits to which it was, or would have been, legally entitled but for defendants' conduct.

**21**

125.     Defendant AIG has been unjustly enriched thereby at the direct expense of the Plan.

126.     The Plan has suffered loss and the damages as a result of defendants conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of other members of the Class, prays for judgment as follows:

1.     Declaring this action to be a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

2.     Declaring that Defendants, together and individually, breached their fiduciary duties under ERISA to Plaintiff and members of the Class;

3.     Declaring that Defendants, together and individually, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

4.     Compelling Defendants to reimburse the Plan for all losses thereto, resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the assets of the Plan, and to restore to the Plan all profits Defendants made through the use of the assets of the Plans, and to restore to the Plan all investment profits that Plaintiff and member of the Class would have made if Defendants had fulfilled their fiduciary obligations;

5.     Enjoining Defendants, together and individually, from any further violations of their fiduciary duties under ERISA;

6.     Awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the individual accounts of Plaintiff and the members of the Class in proportion to the losses of those accounts;

7.     Awarding Plaintiff and the members of the Class damages as a result of the wrongs complained of herein, with pre-judgment and post-judgment interest;

8.     Awarding Plaintiff and the other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

9.       Awarding Plaintiff and the other members of the Class such other and further relief as the Court

may deem just and proper.

Dated: April 28, 2005

                            WECHSLER HARWOOD LLP

                            /s/ Robert I. Harwood

        By :

                            Robert I. Harwood (RH-3286)
                            Samuel K. Rosen (SR-3287)
                            488 Madison Avenue
                            New York, NY 10022
                            Tel.: (212) 935-7400

                            Attorneys for Plaintiff

**23**